# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ROAD SPRINKLER FITTERS LOCAL
UNION NO. 669, U.A., AFL-CIO

CIVIL ACTION

VERSUS

NO. 16-00448-JWD-EWD

CCR FIRE PROTECTION, LLC, ET AL

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## INTRODUCTION AND RULING

1.  In this suit, Plaintiff Road Sprinkler Fitters, Local Union No. 669, U.A., AFL-CIO demands specific performance of what it contends to be a binding contract settling a labor dispute between it and CCR Fire Protection, LLC.[1]

2.  This matter was tried to the Court on May 14-15, 2019. The parties submitted post-trial Proposed Findings of Fact and Conclusions of Law on August 5, 2019.[2] On August 12, 2019, each party submitted reply briefs in response to the other's proposed findings and conclusions.[3] The matter was then submitted.

3.  In making the following findings of fact and conclusions of law, the Court has considered the record as a whole. The Court observed the demeanor of the witnesses who gave live testimony and has carefully weighed their testimony and credibility in determining the facts of this case and in drawing conclusions from those facts. The Court has also carefully reviewed the deposition testimony and exhibits introduced into evidence. The Court has reviewed and considered the briefs and arguments of counsel.

---

[1] Substituted Second Amended Complaint, Doc. 98 at 8-10.
[2] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240.
[3] Defendant's Reply Memorandum in Response to Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law, Doc. 241; Plaintiff's Reply to the Proposed Findings of Fact and Conclusions of Law Submitted by Defendant Quick Response, Doc. 242.

4.    All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact is to be so classified.

5.    For the reasons which follow, the Court finds that Plaintiff has failed to prove its entitlement to the relief sought. Therefore, judgment is rendered in favor of defendants CCR Fire Protection, LLC and Quick Response Fire Protection, LLC and against Plaintiff Road Sprinkler Fitters, Local Union No. 669, U.A., AFL-CIO, dismissing its claims with prejudice.

## THE PARTIES

6.    Plaintiff, Road Sprinkler Fitters, Local Union No. 669, U.A., AFL-CIO (the "Union" or "Plaintiff"), is a national labor organization.[4]

7.    Defendant CCR Fire Protection, LLC ("CCR") is a limited liability company organized under the laws of Louisiana.[5]

8.    Defendant Quick Response Fire Protection, LLC ("Quick Response"), is a limited liability company organized under the laws of Louisiana.

9.    Defendant Earl Barnett was dismissed for Plaintiff's failure to state a claim against him for which relief could be granted.[6] Defendants Nilesh Patel, Rajendra Bhakta, Roseal Rodriguez, J.R. and Theresa Rodriguez were dismissed on summary judgment.[7]

---

[4] Substituted Second Amended Complaint, Doc. 98 at 2.
[5] CCR Business Filing, Doc. 98-1 at 1. CCR never answered. Plaintiff filed a Motion for Clerk's Entry of Default against CCR (Motion for Entry of Default, Doc. 90), and same was entered against CCR on August 27, 2017. (Clerk's Entry of Default, Doc. 91.) Plaintiff then filed a Motion for Default Judgment. Motion for Default Judgment, Doc. 106. The Court ruled that CCR's co-defendants had standing to oppose the motion and, because of unresolved questions of fact as to whether the motion should be granted, denied it and deferred issues of CCR's liability to trial. (Ruling and Order, Doc. 182.) Therefore, CCR was unrepresented at trial by remains a defendant in this case. *See* The Court, Trial Tr. vol. 1, 12:18-13:1, May 14, 2019, Doc. 234.
[6] Ruling and Order on Motion to Dismiss for Failure to State a Claim, Doc. 88 at 3-4.
[7] Ruling and Order on Motion for Summary Judgment, Doc. 197 at 1.

2

# BACKGROUND

10.     Defendant CCR was formed by Nilesh Patel ("Patel"), Rajendra Bhakta ("Bhakta"), and Roseal "J.R." Rodriguez ("Mr. Rodriguez") in 2009 to engage in the business of installing and maintaining fire protection systems.[8]

11.     The membership interests of CCR were owned by Mr. Rodriguez, Patel, Bhakta and Kennon Bridges ("Bridges").[9]

12.     Mr. Rodriguez owned a 40% share in CCR. Patel and Bhakta each owned a 26% share, and Bridges owned 8%.[10]

13.     As the President of CCR, Mr. Rodriguez was in charge of managing CCR from its inception until it closed.[11]  He had authority over the day-to-day operations of CCR, which included the authority to hire and fire CCR's employees.[12] Sometimes, however, he had to answer to Patel and Bhakta in connection with the operation of CCR.[13]

14.     Mr. Rodriguez's wife, Theresa Rodriguez ("Mrs. Rodriguez"), was, at all material times, the Office Manager for CCR.[14]  Her responsibilities included clerical work, such as billing, contracts, and payroll.[15]  She was not an owner or officer of CCR.[16]

---

[8] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 169:12-16, May 14, 2019, Doc. 234; Operating Agreement, J. Ex. J-7; L.L.C. Initial Report, J. Ex. J-8; Articles of Incorporation, J. Ex. J-9; Notice of Change of Members of a L.L.C., J. Ex. J-10.

[9] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 169:16-22, 197:19-198:7, Doc. 234; L.L.C. Initial Report, J. Ex. J-8, at J000094-96; Trial Test. of Nilesh Patel, Trial Tr. vol. 2, 14:3-9, 25:8-14, May 15, 2019, Doc. 235. Mr. Bridges withdrew his membership from CCR on September 12, 2014. *See* Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1., 190:12-18, 208:20-23, Doc. 234; Notice of Change of Members of a L.L.C., J. Ex. J-10 at J000099.

[10] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 169:16-22, 199:21-200:17, Doc. 234; Operating Agreement, J. Ex. J-7 at J000089.

[11] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 179:14-16, 202:19-204:2, Doc. 234 ("Nobody was above me"). Trial Test. of Nilesh Patel, Trial Tr. vol. 2, 41:25-42:2, Doc. 235; Dep. of Anthony Cacioppo, D. Ex. D-34, at 158:16-20.

[12] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 203:22-204:2, Doc. 234.

[13] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 226:12-24, Doc. 234.

[14] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 40:2-14, 78:15-18, May 14, 2019, Doc. 234.

[15] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 226:25-227:6, Doc. 234; Trial Test. of Earl Barnett, Trial Tr. vol. 2, 56:8-11, May 15, 2019, Doc. 235.

[16] Trial Test. of Earl Barnett, Trial Tr. vol. 2, 53:8-10, 56:8-11, Doc. 235.

15. In May 2013, CCR entered into a collective bargaining agreement ("CBA") with the Union, pursuant to which CCR agreed, *inter alia*, to be bound by the terms of the 2013-2016 National Agreement between the Union and the National Fire Sprinkler Association, Inc. ("NFSA").[17]  The CBA covered CCR's sprinkler fitter employees.[18]

## PROCEEDINGS BEFORE THE NLRB

16. In June 2014, CCR attempted to repudiate the CBA by sending a letter to the Union, claiming that the CBA was "null and void."[19]

17. The Union objected, and on August 8, 2014, filed unfair labor practice ("ULP") charges against CCR with the National Labor Relations Board, Region 15 ("NLRB" or "Board"), alleging multiple violations of the National Labor Relations Act (the "NLRA"), including CCR's failure to make payments to various union benefit funds as required by the CBA, as well as its failure to remit work assessment dues to the Union as required by the CBA.[20]

18.  The NLRB issued a Complaint against CCR on September 30, 2015 alleging multiple violations of the NLRA.[21] The Complaint alleged, *inter alia*, that CCR had unlawfully solicited and assisted employees in quitting the Union, unilaterally reduced wages to less than what was required by the CBA, and discontinued contributions to the benefit

---

[17] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 14:1-21, Doc. 234; Arkansas, Mississippi, Louisiana Agreement, J. Ex. J-1, at J000002; Agreement between NFSA and Union, J. Ex. J-2, at J000006-7; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 169:23-170:23, 239:20-240:1, Doc. 234.
[18] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 243:2-11, Doc. 234.
[19] Letter to Union, Pl. Ex. P-1, at P000001; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 14:25-15:12, Doc. 234.
[20] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 79:24-82:4, Doc. 234; NLRB Charge Against Employer, Def. Ex. D-1, at DEF000001 ("Beginning in or around March 2014 and continuing to date, [CCR] has violated Section 8(a)(5) [of the NLRA] by…unilaterally discontinuing contributions to the benefit funds, and unilaterally discontinuing the deduction of work assessment authorized by the unit employees and required by the CBA."); Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 210:5-12, Doc. 234..
[21] NLRB Charge Against Employer, Def. Ex. D-1, at DEF000001; Complaint and Notice of Hearing, J. Ex. J-3.

funds.[22] This Complaint was accompanied by a hearing notice.[23]

19. The hearing was originally scheduled for a date in January 2016, in New Orleans, Louisiana.[24]

## SETTLEMENT NEGOTIATIONS AND PUTATIVE SETTLEMENT

20. On January 19, 2016, Mrs. Rodriguez sent an email to Union attorney Natalie Moffett ("Moffett") requesting a continuance of the Board hearing.[25] Moffett, on behalf of the Union, agreed to continue the hearing by three weeks to February 16, 2016[26], as long as Mrs. Rodriguez agreed to meet with another Union attorney, William Osborne ("Osborne") and Union Business Agent Anthony "Tony" Mr. Cacioppo ("Cacioppo") for an off-the-record settlement discussion on Sunday, January 24, 2016.[27]

21. On January 24, 2016, Mrs. Rodriguez met with Osborne and Cacioppo to discuss settlement of the NLRB case against CCR.[28] Mrs. Rodriguez testified that in that meeting, Osborne "was told about the IRS lien[.]"[29] She further testified that Osborne proposed terms of settlement, which included payment by CCR of $450,000 for unpaid Union benefit contributions.[30]

---

[22] Complaint and Notice of Hearing, J. Ex. J-3, at ¶¶ 6, 7, 13; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 19:22-20:5, 82:21-24, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 210:16-211:2, Doc. 234.
[23] Complaint and Notice of Hearing, J. Ex. J-3, at ¶¶ 6, 7, 13.
[24] Complaint and Notice of Hearing, J. Ex. J-3, at J000070.
[25] 1/19/2016 Email Correspondence between Moffett and Theresa, Def. Ex. D-5 , at DEF000006.
[26] Contrary to this email, however, the hearing was held on February 17, 2016.
[27] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 84:14-85:4, Doc. 234; 1/19/2016 Email Correspondence between Moffett and Theresa, at DEF000006; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:3-15, May 14, 2019, Doc. 234.
[28] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 85:5-86:13, Doc. 234. *See also* Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:17-19, Doc. 234.
[29] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 85:16-24, 87:12-18, Doc. 234.
[30] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 85:16-86:8, Doc. 234.

22. On January 26, 2016, Mrs. Rodriguez sent an email to Osborne and Moffett requesting more information about the settlement.[31]

23. On February 15, 2016, Osborne responded by email to Mrs. Rodriguez; Moffett was copied.[32] In the email, Osborne proposed terms of settlement, which included an agreement by CCR to pay "$450,000 payable in monthly installments over 8 years" and to "remain bound to the current and any successor agreements with Local 669 for the same term."[33]

24. That same day, Mrs. Rodriguez responded by email to Osborne and Moffett and posed "[q]uestions from the owners" of CCR, which included the following: "What if the IRS decides that we are not a viable company and decides we need to close?"[34]

25. Moffett testified that, as of the date of this email, she was aware that CCR had an IRS debt of over $1,000,000.[35] She also understood Mrs. Rodriguez to be asking on behalf of CCR's owners "what would happen if the IRS decided they [CCR] were not a viable company."[36] Moffett further testified that, at this point in time, she was aware that if someone was in trouble with the IRS, the IRS was probably going to get its money first,[37]

---

[31] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 92:5-16, Doc. 234; 1/26/2016 email from Theresa to Osborne, Def. Ex. D-6, at DEF000007; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:20-24.

[32] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 92:17-20, 93:2-7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:3, Doc. 234;

[33] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 93:2-7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4, at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:3, Doc. 234;

[34] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 93:2-7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4, at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18-25, 136:4-7, 149:11-16, Doc. 234;

[35] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:11 ("That's all we were aware of, that they [CCR] had some IRS debt. … I think I had heard [that the IRS debt was over a million dollars] [.]"), 154:19-24, 161:10-19, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4.

[36] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18-136:7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4.

[37] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-11, Doc. 234.

that if the IRS had a tax lien against someone, the IRS was going to recover its money,[38] and that an IRS tax lien takes precedence over all other encumbrances.[39]

26. Likewise, Cacioppo testified that he was aware, a few days before February 17, that CCR "owed . . . money to the IRS."[40]

27. The NLRB trial began on February 17, 2016 in New Orleans, Louisiana.[41]

28. At the trial, CCR was represented by Mr. and Mrs. Rodriguez in person and by Patel who was participating by telephone.[42] CCR was not represented by legal counsel as Mr. and Mrs. Rodriguez were not attorneys.[43]

29. Moffett and Cacioppo were present for the Union.[44] Ms. Caitlin Bergo and Mr. Beauford Pines were present for the Board.[45]

30. At the beginning of the hearing, the Union and CCR resumed settlement negotiations.[46] These negotiations lasted for a couple of hours.[47] The NLRB Administrative Law Judge ("ALJ") did not participate in and was not present for these negotiations.[48]

---

[38] .Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:12-14, Doc. 234.

[39] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:12-14, Doc. 234

[40] Dep. of Anthony Cacioppo, Def. Ex. D-34, at 127:2-128:8.

[41] *See* Transcript of NLRB Hearing, J. Ex. J-5; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 23:17-20, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:6-14 Doc. 234.

[42] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 174:13-175:3, Doc. 234; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 23:17-24:11, Doc. 234.

[43] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 79:15-20, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 194:12-17, 197:11-18, 213:8-9, Doc. 234.

[44] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 25:7-8, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 136:20-22, 137:2-3, 137:8-10, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 174:16-18, 212:19-213:1, Doc. 234; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 124:2-10, 128:14-16.

[45] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 24:1-2, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 174:16-18, 213:2-7, Doc. 234.

[46] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 28:11-16, 96:24-97:21, 124:14-124:5, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 137:11-21, 150:15-18, 163:23-164:14, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 213:18-214:19, Doc. 234; Transcript of NLRB Hearing, J. Ex. J-5.

[47] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 164:7-14, Doc. 234; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 139:2-16.

[48] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 96:24-97:4, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 137:11-16, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 214:4-9, Doc. 234; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 133:17-134:2.

31.     Much of what was discussed during these negotiations is not disputed. The issue of CCR's existing tax debt to the IRS was discussed.[49]  Moffett testified that Mr. and Mrs. Rodriguez "mentioned an IRS debt" and discussed the fact that "the IRS lien [had] an effect on the Company's cash on hand."[50]  Likewise, Cacioppo testified that both Mr. and Mrs. Rodriguez informed him that CCR owed the IRS some money.[51]

32.     What is hotly disputed is whether, during these negotiations, Mr. and Mrs. Rodriguez told the Union's representatives that a condition of the settlement was that the IRS would have to approve the settlement before it would become binding, and whether the Union agreed to this condition. This issue is taken up in another section of the ruling.

33.     Following these negotiations, CCR entered into a settlement of the NLRB Complaint against it.[52] For sake of convenience, the Court will refer to this as the "Settlement Agreement" although the main issue in this case is whether this agreement is binding and enforceable.

34.     The terms of the Settlement Agreement were put on the record before the NLRB ALJ by Moffett[53] and were specifically approved on the record by CCR before the NLRB ALJ.[54] There is a dispute as to whether the terms had been presented to and reviewed by CCR's

[49] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 104:15-105:4, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:3-5, 143:15-17, 155:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement , Def. Ex. D-8; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4-15-137:21.
[50] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:3-5,143:15-17, 155:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8 at DEF 000009-10
[51] Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4-15-137:21.
[52] Transcript of NLRB Hearing, J. Ex. J-5, at J000081; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 28:11-29:10, Doc. 234; Dep. of Anthony Cacioppo, Pl. Ex. P-22, at 130-143.
[53] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 28:11-29:10, May 14, 2019, Doc. 234; Transcript of NLRB Hearing, J. Ex. J-5; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 139:20-140:20, 153:17-21, May 14, 2019, Doc. 234; Transcript of NLRB Hearing, J. Ex. J-5; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 178:2-3, 217:9-218:13, May 14, 2019, Doc. 234; Transcript of NLRB Hearing, J. Ex. J-5.
[54] Transcript of NLRB Hearing, J. Ex. J-5, at J000081-82; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 29:5-10, Doc. 234.

co-owners, Patel and Bhakta, two days earlier.[55] The Court finds it unnecessary to resolve this dispute.

35.   Specifically, Moffett read into the record the following terms:

> "CCR Fire Protection will pay $450,000 in monthly installments over eight years to the Union and Union benefit funds with a down payment in an amount to be agreed upon by the parties at a later date.
>
> There will be a confession of judgment in the federal court case related to the unpaid benefit funds.
>
> CCR will mail a notice to employees that I understand will be attached here and read into the record.
>
> CCR will continue to recognize and bargain with the Union as its Section 9(a) bargaining representative of the CCR employees.
>
> And CCR will continue to be bound to and comply with its current and any subsequent collective bargaining agreement with Local 669."[56]

36.   Mrs. Rodriguez agreed to these terms on the record on CCR's behalf: "CCR is agreeable to that."[57]  There was no mention of the IRS approval requirement.

37.   During the hearing and in compliance with the terms of the Settlement Agreement, the Union withdrew its ULP charges against CCR.[58]

38.   CCR and the Union also drafted the formal Notice to be posted by CCR. The Notice restated the terms of the Settlement Agreement, was initialed by Mr. Rodriguez on behalf

---

[55] E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 16:9-19:18, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 171:19-173:23, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:15-136:19, Doc. 234. CCR co-owner Patel denied participating in and approving the NLRB Settlement. Trial Test. of Nilesh Patel, Trial Tr. vol. 2, 18:20-19:25, 20:10-21:21, 22:4-23:20, Doc. 235. Patel also denied generating the earlier attempt by CCR, in 2014, to repudiate its CBA with the Union. Trial Test. of Nilesh Patel, Trial Tr. vol. 2, 14:17-18:3, Doc. 235. The CCR letter to Union seems to have been written on Patel's behalf ("This firm representing CCR Fire Protection, LLC ("CCR") and Neil Patel and Ray Bhakta…"). Letter to Union, Pl. Ex. P-1, at P000001. On both issues, Patel's testimony was contradicted by both Rodriguezes. Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 24:5-17, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 177:7-13, Doc. 234.
[56] Transcript of NLRB Hearing, J. Ex. J-5, at J000081:15-25, J000082:1-3.
[57] Transcript of NLRB Hearing, J. Ex. J-5, at J000082 (line 5).
[58] Transcript of NLRB Hearing, J. Ex. J-5, at J000083; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 162:25-163:9, Doc. 234.

of CCR, and was received into the NLRB record.[59]

39.    The Settlement Agreement was amended later that day to provide that $3300 of the $450,000 would be paid as back wages to a terminated CCR employee. That part of the agreement was ultimately performed by CCR's payment of the backpay.[60]

40.    Despite the agreement reached on the record, it is clear and undisputed that certain terms were left unresolved at that time. These included the amount of the down payment and, therefore necessarily, the amount of the monthly installments as it related to the $450,000 settlement payment.[61] Indeed, the agreement specifically stated that this would be "agreed upon by the parties at a later date."[62] Other terms not included on the record were the amounts related to the confession of judgment, how long CCR would continue to be bound to and comply with the current and any subsequent collective bargaining agreements, and CCR's agreement to pay a former employee $3300 in back wages.[63]

41.    There are two main areas of contention at the center of whether the contract is binding and enforceable. First, was IRS approval a condition of the settlement. Second, were any of the unresolved terms of the settlement "material or essential" such that, despite the on the record Settlement Agreement, there was no binding contract formed on February 17, 2016.

**CCR'S ALLEGED IRS CONDITION**

---

[59] Union Flyer, Pl. Ex. P-3; Transcript of NLRB Hearing, J. Ex. J-5, at J000082.
[60] Joint Motion to Amend the Record, Pl. Ex. P-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 32:13-22, May 14, 2019, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 142:5-20, Doc. 234.
[61] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 101:2-11, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:18-25, Doc. 234.
[62] Transcript of NLRB Hearing, J. Ex. J-5, at J000081:15-25, J000082:1-3.
[63] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 101:12-18, 101:25-104:13, May 14, 2019, Doc. 234. *See also*, Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 97:22-99:5, 99:22-100:14, Doc. 234; Terms of Settlement, J. Ex. J-6.

42.     According to Mr. and Mrs. Rodriguez, during the February 17, 2016 negotiations, they explained to Moffett and Cacioppo that, given CCR's sizable debt to the IRS, the settlement was conditioned on the IRS approving the settlement.[64]  This is disputed by Moffett who testified that, while she understood CCR owed money to the IRS, the Settlement Agreement  was not conditioned on IRS approval.[65]

43.     According to Mrs. Rodriguez, before going back on the record at the NLRB hearing, the Union acknowledged that IRS approval would be part of the terms of settlement.  More specifically, Moffett had drafted notes that the parties were using to negotiate the terms of settlement.[66]  Mr. Rodriguez testified that, after reviewing these notes, he pointed out to Moffett that the IRS condition was not in the notes, and, in response, Moffett represented to Mr. Rodriguez that the IRS condition would be included in the final, written agreement that would be mailed to CCR.[67]  According to Mrs. Rodriguez, based on this representation, CCR believed that the Union had agreed that the settlement was

---

[64] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 28:11-16, 35:21-25, 96:24-97:21, Doc. 234 (testifying that she notified Mr. Cacioppo and Ms. Moffett during settlement negotiations "at the end of every sentence" that the additional debt was "pending what the IRS" would approve in terms of "what could be paid and what couldn't be paid"); Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16),J. Ex. J-31; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 175:4-177:1, 214:20-218:22, May 14, 2019, Doc. 234 ("We discussed the terms with Ms. Moffett and Tony."); Terms of Settlement, J. Ex. J-6.
[65] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 146:25-147:6, May 14, 2019, Doc. 234 (Q: And the email [J. Ex. J-31] speaks for itself, but it mentions in the first paragraph that the settlement was "pending what the IRS said we could do about the Agreement"?... A: That's what it says, but that's not what we agreed to. Q: Had you ever heard prior to this e-mail anything about IRS conditional approval? A: No.).
[66] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:15-18, Doc. 234.
[67] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 175:4-177:1, 214:20-218:22 Doc. 234;, Terms of Settlement, J. Ex. J-6.*See also*, Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 216:21-24, ("[Ms. Moffett] presented it.  It wasn't on there.  I told her it wasn't on there and she was going to add it on there and she said it would be added onto the document that we would be mailed[.]"), 218:15-19 ("We discussed the terms with Ms. Moffett and Tony.  She said that there would be a written letter with the terms on there, the actual terms, everything that needed to be agreed to on there and mailed to us."), Doc. 234.

subject to IRS approval[68] and knew that CCR could not formally agree to the settlement without this approval.[69]

44. The Settlement Agreement terms memorialized in the NLRB record did not include any terms conditioning the settlement on IRS approval. Indeed, there was no reference whatsoever to the IRS. Nor did the Notice or amendment to the Settlement Agreement, both prepared that day, include any terms conditioning the agreement on IRS approval or make reference to the IRS.[70]

45. Quick Response admits that, in pre-settlement correspondence between CCR and the Union, the parties did discuss an IRS problem, but only as a separate issue from the proposed settlement terms. On February 15, 2016, two days prior to the NLRB hearing and settlement, Mrs. Rodriguez, emailed the Union and asked: "What if the IRS decides that we [CCR] need to close?" The Union replied the following day that if, at some later date, the IRS ordered CCR to close, "the company would be required to negotiate [with the Union] over the closing…."[71]

46. According to Quick Response, before and during the settlement negotiations of February 17, the Union understood that CCR owed over $1 million dollars to the IRS,[72] that CCR was subject to a federal tax lien,[73] that the lien "ha[d] an effect on the Company's cash

---

[68] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 217:3-8, Doc. 234. *See also*, Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 96:24-97:21, Doc. 234.
[69] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 214:20-25, Doc. 234 ("[T]hat was just a given that we had to have that approval or we couldn't do anything.").
[70] Transcript of NLRB Hearing, J. Ex. J-5, at J000081-82; Union Flyer, Pl. Ex. P-3; Joint Motion to Amend the Record, Pl. Ex. P-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 29:11-17, May 14, 2019, Doc. 234. *See also*, Terms of Settlement, J. Ex. J-6 (Moffett notes of settlement terms).
[71] Settlement Proposal Email, J. Ex. J-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 16:7-19:18, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18-136:19, May 14, 2019, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:16, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 171:19-173:23, May 14, 2019, Doc. 234.
[72] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:11, 154:19-24, 161:10-19, May 14, 2019, Doc. 234; Settlement Proposal Email, J. Ex. J-4.
[73] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 85:16-24, 87:12-18, May 14, 2019, Doc. 234.

on hand,"[74] that an IRS tax lien takes precedence over all other encumbrances,[75] and that CCR's very existence was in jeopardy by virtue of its debt to the IRS.[76]

47. Specifically, during the February 17 negotiations, CCR raised with the Union the issue of CCR's existing tax debt to the IRS.[77] Moffett admitted that Mr. and Mrs. Rodriguez "mentioned an IRS debt" and that they discussed the fact that "the IRS lien [had] an effect on the Company's cash on hand."[78] Likewise, Cacioppo admitted that both Mr. and Mrs. Rodriguez informed him that CCR owed the IRS some money.[79]

48. Quick Response attempts to explain and justify the failure of Mr. and Mrs. Rodriguez to insist that the IRS approval condition be made a part of the Settlement Agreement read into the record by pointing to the fact that Mr. and Mrs. Rodriguez were not lawyers and that they were assured by Moffett that this condition would be put in the final written agreement.[80]

49. Mrs. Rodriguez testified that, after the February 17 hearing, she contacted the IRS about the settlement with the Union, specifically to discuss the proposed amounts that the Union would be requiring of CCR as additional monthly payments, which included the yet-to-be determined monthly payments for the $450,000 settlement payment, as well as the additional $19,000 to $30,000 per month estimate that would have been required

---

[74] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:15-17, 155:20-23, Doc. 234;2/26/2016 Email from Moffett to Theresa re: draft settlement agreement , Def. Ex. D-8.

[75] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-14, Doc. 234.

[76] *See* Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 93:2-7, Doc. 234; Settlement Proposal Email, J. Ex. J-4, at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18-136:7, 149:11-16, Doc. 234; Settlement Proposal Email, J. Ex. J-4.

[77] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 104:15-105:4, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:2-5, 143:15-17, 155:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4-137:21.

[78] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:2-5, 143:15-17, 155:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8.

[79] Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4-137:21.

[80] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240, ¶38, at 11.

under the existing CBA and any subsequent CBA.[81]  Mrs. Rodriguez learned that the IRS was not going to allow these additional payments.[82]

50.  Mr. Rodriguez testified that he then called the IRS "to see if [he] could work out something because [he] wanted to stay in business."[83]  Mr. Rodriguez spoke with the same IRS agent that CCR had been making payments to as part of the payment plan it had with the IRS.[84]  He received the same information as Mrs. Rodriguez.[85]  Based on his conversation with the IRS agent, Mr. Rodriguez came away with an understanding that CCR could not incur any additional debt as proposed by the Settlement Agreement until the IRS was paid first.[86]  Consequently, he concluded that CCR could not effectuate the settlement with the Union.[87]

51.  Plaintiff points to a July 20, 2016 affidavit given by Mrs. Rodriguez to the NLRB, where she states that the "only conversation I had with the IRS about the settlement with the Union" took place after the February 17 hearing and that she "never submitted anything in writing to the IRS about the settlement."[88] The IRS never ordered CCR to close or to reject the NLRB Settlement.

## THE UNRESOLVED TERMS OF THE AGREEMENT

52.  Quick Response argues that the purported settlement on the record was not complete, as the parties agreed that additional terms and conditions were to be worked out between

[81] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 94:20-96:5, May 14, 2019, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 222:15-20, May 14, 2019, Doc. 234.
[82] *See* Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 96:6-18, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 223:1-4, Doc. 234.
[83] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 223:5-7, Doc. 234.
[84] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 223:8-24, Doc. 234.
[85] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 223:25-224:6, Doc. 234 ("They wanted their money in full. They wasn't concerned about any other debts.").
[86] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 224:7-11, Doc. 234.
[87] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 224:12-15, Doc. 234.
[88] Theresa Rodriguez Affidavit, Pl. Ex. P-21, at 4:55-58.

the Union and CCR. These additional terms included, among other things, the amount of the down payment and the amount of the monthly installments as it related to the $450,000 settlement payment.[89] Other terms not included on the record were the amounts related to the confession of judgment, how long CCR would continue to be bound to and comply with the current and any subsequent collective bargaining agreements, and CCR's agreement to pay a former employee $3300 in back wages.[90] Therefore, the recitation of the Settlement Agreement into the record before the ALJ was not, argues Quick Response, a final, complete and enforceable settlement, as there were additional material terms to be worked out.[91]

53.    Plaintiff counters that Mrs. Rodriguez's NLRB affidavit refutes Quick Response's claim that the Settlement Agreement was only preliminary, incomplete, and/or missing material terms. In her sworn affidavit, she described it as "the settlement CCR agreed to at the hearing" and as pending only IRS approval.[92]

54.    Quick Response argues that even Moffett admitted that the record was not complete. She testified that when the ALJ said "that's it," this was inaccurate as they forgot to put on the record that CCR would agree to pay its former employee $3300 in back wages.[93]

55.    Following the February 17 hearing, Moffett forwarded to Mrs. Rodriguez what Moffett described as "a draft settlement that captures the parties' verbal agreement."[94] The Court

---

[89] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 101:2-11, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:18-22, Doc. 234.

[90] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 101:12-18, 101:25-104:13, Doc. 234. *See also*, Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 97:22-99:5, 99:22-100:14, Doc. 234; Terms of Settlement, J. Ex. J-6.

[91] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240, ¶ 39 at 11.

[92] Doc. 239, ¶ 24 at 7, citing Theresa Rodriguez Affidavit, Pl. Ex. P-21, at 2:27.

[93] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240, ¶ 40 at 12, citing Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 153:17-154:18, Doc. 234.

[94] 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement Def. Ex. D-8, at DEF000009-10.

will refer to this as the "Draft Settlement."[95] Quick Response points out that, in paragraph 1 of the Draft Settlement, Moffitt changed the payment term from eight to nine years, which the parties had "not negotiated."[96] She explained that she "was making a proposal, including a very low down payment and lower monthly payments," in order to "spread it out over a longer period of time in order to make those monthly down payments lower."[97]

56.    Moffett also testified that CCR had not agreed to this proposed extension of the payment term, nor had CCR agreed to the proposed $25,000 down payment or the $4400 monthly note as set forth in the Draft Settlement.[98] She reiterated that she "was making an initial proposal as to the down payment and the monthly installments with the hopes of getting [CCR] started on their payments as soon as possible."[99]

57.    Quick Response maintains that the Draft Settlement differed in other substantive respects from the terms read into the record. For example, it required that all settlement payments be automatically withdrawn from CCR's bank account, it outlined the amount the Union benefit funds would receive versus the amount the Union would receive from the monthly installments, it included an agreement by CCR to be bound to and comply with the existing CBA and any subsequent CBAs for a specified duration, specifically, the 9-year term of the settlement payments, and it included an agreement by CCR that, even if

---

[95] The Draft Settlement is found at Def. Ex. 8 at DEF000011-15.
[96] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 151:14-15, 156:7-16, May 14, 2019, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000011.
[97] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:15-20, Doc. 234.
[98] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:21-157:5, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000011-12.
[99] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:21-157:2, Doc. 234.

it were to pay off the settlement obligation early, it would still be bound to the 9-year term of the CBA.[100]

58. The Draft Settlement also included a statement by the parties that the agreement represented "the full and final Agreement between them." This, argues Quick Response, indicates that the Draft Settlement was the proposed final expression, as set forth by the Union, of the parties' intent.[101]

59. The Draft Settlement also did not include a term concerning IRS approval.[102]

60. The Draft Settlement was never signed by CCR or the Union.[103]

## CCR'S REPUDIATION OF NLRB SETTLEMENT

61. Although CCR made the required back wages payment to the wrongfully terminated CCR employee, CCR failed to make any of the other payments required by, or to otherwise comply with the Settlement Agreement.[104]

62. Counsel for the Union sent a series of e-mails to CCR after the NLRB hearing and Settlement Agreement attempting to get CCR to sign the Draft Agreement. CCR did not respond to these e-mails.[105]

---

[100] *See* Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 104:15-19, 105:5-7, 106:4-107:5, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement , Sections 3, 4, 10, 11, Def. Ex. D-8, at DEF000012-14; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 219:2-220:20, Doc. 234. *See also,* Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 219:12-21, Doc. 234 (testifying that he "wouldn't have agreed" to the automatic withdrawal of settlement payments from CCR's bank account).

[101] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240, ¶ 45 at 13, citing 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000011.

[102] *See* 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000011-18.

[103] *See* Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 222:1-5, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000014-15.

[104] Email Chain, Def. Ex. D-8; Email reminding to review settlement, Def. Ex. D-10; 3/9/2016 email from Moffett to Theresa re: finalizing settlement, Def. Ex. D-11.

[105] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:15-145:4, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8; Email reminding to review settlement, Def. Ex. D-10; 3/9/2016 email from Moffett to Theresa re: finalizing settlement, Def. Ex. D-11.

63. On about March 11, 2016, after Mr. Rodriguez had talked to the IRS, he and Patel made the decision to close CCR.[106] The decision was made to close CCR because of its financial burdens.[107]

64. On about March 11, 2016, Mrs. Rodriguez announced to CCR's employees that CCR was closing.[108]

65. On about March 14, 2016, Mrs. Rodriguez informed Cacioppo that CCR was closing because the IRS allegedly told her that CCR's first obligation was to the IRS.[109]

66. According to the Rodriguez's testimony, CCR closed and ceased providing fire protection services on about March 18, 2016 and has not provided those services since.[110] CCR still exists as a legal entity.[111]

67. After CCR failed to respond to the Union's requests to complete the settlement, the Union's counsel wrote to the NLRB on March 24, 2016 in protest.[112]

68. On March 25, 2016, Mrs. Rodriguez, on behalf of CCR, responded by e-mail, claiming for the first time that the NLRB Settlement was void because the IRS had not approved it.[113] The email was sent to Moffett and Cacioppo, among others, and reiterated her belief

---

[106] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 111:15-16, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 187:7-11, 194:18-195:1, 224:16-226:6, Doc. 234. *See also*, Trial Test. of Nilesh Patel, Trial Tr. vol. 2, 28:7-30:7, May 15, 2019, Doc. 235.

[107] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 108:23-109:3, Doc. 234 ("Because of the IRS 1.2 million. The owners were starting to fight amongst themselves. It was over. ..."); Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 225:16-21, Doc. 234.

[108] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 112:9-13, Doc. 234.

[109] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 35:21-25, 108:18-109:3, Doc. 234; Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16),J. Ex. J-31, at J000235.

[110] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 112:9-17, Doc. 234; Trial Test. of Earl Barnett, Trial Tr. vol. 2, 117:21-24, May 15, 2019, Doc. 235; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 166:16-167:6.

[111] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 236:11-16, Doc. 234. *See also*, States Official Report for CCR, J. Ex. J-32.

[112] Revocation of Settlement Agreement Letter, Pl. Ex. P-20; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 145:5-146:14, Doc. 234.

[113] Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16),, J. Ex. J-31, at J000235; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 33:21-38:4, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 146:18-147:23, Doc. 234.

that the settlement agreement was subject to IRS approval and that this had been communicated to them on multiple occasions during settlement negotiations: "The agreement was entered into with good intentions and faith. But what was not written and signed, is the fact that this was all pending what the IRS said we could do about this agreement. This comment was stated many times by Rosael and myself to Tony and Ms. Moffett."[114]

69. On July 1, 2016, the Union filed suit against CCR, Quick Response and others.[115]

### ISSUES AND SUMMARY OF PARTIES' CONTENTIONS

70. The central issue in the case is whether the February 17, 2016 Settlement Agreement between CCR and Union, put on the record during the NLRB hearing, is a binding contract. Plaintiff contends that it is. Quick Response maintains it isn't.

71. As mentioned earlier, both sides agree that there were terms of the contract left unresolved at the time the agreement was put on the record.[116] These included:

    a.  the amount of the down payment;

    b.  the amount of monthly installments;

    c.  how long CCR would continue to be bound by the current and future CBAs;

    d.  the amount to be paid to a former CCR employee.

72. Whether the agreement was a binding contract depends first, on whether the settlement was contingent on IRS approval. If it was, as Quick Response contends, then there was no binding contract since the IRS never "approved" the contract.

---

[114] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 35:21-25, 108:7-17, May 14, 2019, Doc. 234; Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16),, J. Ex. J-31, at J000235.

[115] Complaint, Doc. 1. Defendant Earl Barnett was dismissed for Plaintiff's failure to state a claim against him for which relief could be granted. (Doc. 88.) Defendants Nilesh Patel, Rajendra Bhakta, Roseal Rodriguez, J.R. and Theresa Rodriguez were dismissed on summary judgment. (Doc. 197.)

[116] Doc. 239 at 19, ¶ 65; Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240 at 11, ¶ 39.

73. Second, were any of the matters left unresolved at the time the agreement was put on the record (most prominently, the amounts to be paid by CCR as the down payment and monthly installments), "material or essential terms." If they were, as Defendant contends, there was no binding contract. If they weren't material or essential but rather, merely incidental, then the contract could be binding despite the unresolved terms.

74. If the Settlement Agreement was a binding contract, then CCR is clearly liable. But whether Quick Response would also be liable to the Union depends on whether it is the alter ego or *Golden State* successor to CCR. Plaintiff argues it is both. Quick Response insists that it is neither.

**FINDINGS OF FACT RE IRS APPROVAL**

75.  While Quick Response argues that the Settlement Agreement was conditioned on IRS approval, the great weight of the evidence establishes it was not. While the Union was aware of the large amount owed by CCR to the IRS, approval by the IRS was never a condition of the settlement.

76. First and foremost, the Court notes that the Settlement Agreement itself says nothing about this alleged condition.[117] And after the terms were read into the record, Mrs. Rodriguez expressly stated that "CCR is agreeable to that."[118] Neither she nor Mr. Rodriguez said anything to the ALJ suggesting that CCR's agreement to the terms stated on the record was somehow "conditioned" on any other, unstated term.

77. The only evidence Quick Response points to in support of its position that the Settlement

---

[117] Transcript of NLRB Hearing, J. Ex. J-5; *see also* Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 29:11-17, May 14, 2019, Doc. 234. (Q: The first paragraph of the settlement that's read into the record starts with "CCR Fire Protection will pay $450,000 in monthly installments." Do you see that? A: Pending IRS I do see it. Q: I'm sorry, does it say anything about the IRS? No, it does not.)
[118] Transcript of NLRB Hearing, J. Ex. J-5, J000082; Trial Test. of Theresa Rodrigues, Trial Tr. vol. 1, 29:5-10.

Agreement was conditioned upon IRS approval is the testimony of Mr. and Mrs. Rodriguez. However, the Court finds the testimony of both these witnesses lacks credibility, especially as it pertains to this critical issue.[119]

78.    The testimony of Mrs. Rodriguez was internally inconsistent. When questioned by Plaintiff's counsel about the settlement negotiations, Mrs. Rodriguez testified that she was not directly involved in the February 17 negotiations:

> Q:  During the day when you were at the – this was – was the hearing at the NLRB offices?
> A:  Yes.
> Q:  And Natalie Moffett was there?
> A:  Yes.
> Q:  And you and she and JR and Mr. Patel by phone discussed settling the NLRB case?
> A:  No, I never discussed it. I can't make the decisions for CCR.
> Q:  I'm not ---
> A:  I heard the conversation but I did not --- I was not involved in the discussion of it.[120]

79.    Yet, when questioned by counsel for Quick Response, Mrs. Rodriguez reversed herself and testified she told Moffett and Cacioppo "at the end of every sentence" that the Settlement Agreement was pending IRS approval.[121]

80.    Mr. Rodriguez attempted to support his wife's contention that IRS approval was a term of the settlement agreement. He testified that Union counsel Moffett expressly agreed to incorporate IRS approval as a term of the Settlement Agreement, testifying that "she said it would be added onto the document that would be mailed."[122]

---

[119]The Court, Trial Tr. vol. 2, 154:21-23, May 14, 2019, Doc. 235 (The Court noted at the conclusion of the trial, "I do think it fair to the parties to say that I was not impressed with the testimony of Theresa Rodriguez and J.R. Rodriguez.")

[120] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 25:1-16, Doc. 234.

[121]Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 97:18-21, Doc. 234 (Q: Did you notify Mr. Cacioppo and/or Ms. Moffett during these negotiations that it was pending the IRS approval of the additional debt? A: At the end of every sentence.).

[122] Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 216:23-24, Doc. 234.

81.     By contrast, the Court finds Moffett's testimony on this issue to be entirely credible and consistent with the contemporaneous documentary evidence.

82.     Moffett testified clearly and unequivocally that the Settlement Agreement was *not* conditioned on IRS approval.[123] When questioned by the Court, she rebutted Mrs. Rodriguez's assertion that Mrs. Rodriguez had insisted on IRS approval during the February 17 negotiations.[124] She testified that at no point during the negotiations had anyone from CCR told her that settlement was conditioned on IRS approval.[125]

83.     In addition, the Court notes that Moffett had been practicing law for over ten years at the time of the NLRB trial.[126] Given that level of experience, the Court finds it wholly implausible that Moffett would have left out the need for IRS approval from her recitation of the parties' material terms of settlement had such approval actually been part of the parties' agreement. Nor is it plausible that Moffett would have withdrawn the pending unfair labor practice charges against CCR with such a contingency unresolved.

84.     In addition to its internal inconsistency, the testimony of Mr. and Mrs. Rodriguez is inconsistent with the documentary evidence presented at trial. In pre-settlement

---

[123]Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 146:25 – 147:6, Doc. 234 (Q: And the email (Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16),, J. Ex. J-31, at J000235) speaks for itself, but it mentions in the first paragraph that the settlement was "pending what the IRS said we could do about the Agreement"?. . . A: That's what it says, but that's not what we agreed to. Q: Had you ever heard prior to this email anything about IRS conditional approval? A: No.).

[124] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 164:15-21, Doc. 234 (Court: During the time that y'all were discussing this, Mrs. Rodriguez testified earlier today that – and I don't have her exact language – but the words to the effect that after every term was mentioned by you or Mr. Cacioppo she would add the phrase 'pending IRS approval.' Did she do that? A: No, not that I recall.).

[125]Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 140:21 – 141:8, Doc. 234 (Q: At any time from the exchange of emails two days before the hearing to this point in the hearing, did either Mr. Rodriguez or Mrs. Rodriguez tell you in any terms that the IRS approval of this settlement was a condition of settlement? A: No. Q: They never proposed that? A: No. Q: And did they mention the IRS at all during the discussions before you went back on the record? A: Yes. They mentioned an IRS debt. Q: Okay. But there was nothing about a condition of settlement? A: No, not at all.); Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 147:7-9, Doc. 234 (Q: Had you ever heard prior to this email (Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16),, J. Ex. J-31, at J0000235) anything about IRS conditional approval? A: No.).

[126] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 133:10-13, Doc. 234.

correspondence between CCR and the Union, while the parties did discuss CCR's IRS problem, it was not presented as a condition of the settlement. On February 15, 2016, two (2) days prior to the NLRB hearing and settlement, Mrs. Rodriguez, e-mailed the Union, asking: "What if the IRS decides that we [CCR] need to close?" The Union replied that if, at some later date, the IRS ordered CCR to close, "the company would be required to negotiate [with the Union] over the closing…."[127]

85. Neither the Notice nor the amendment to the Settlement Agreement, both prepared on February 17, included terms conditioning the agreement on IRS approval nor did they even reference the IRS.[128]

86. On February 26, 2016, when Moffett forwarded the Draft Settlement to Mrs. Rodriguez, she wrote, "[a]s you and JR discussed last week, we understand that the IRS lien has an effect on the Company's cash on hand. It would be useful if we could see the documents detailing that lien so we can best accommodate it where necessary with the Agreement."[129]

87. Having received the Draft Settlement from Moffett, neither she nor Mr. Rodriguez immediately protested about the absence of language regarding the alleged condition of IRS approval.

88. The first mention of the purported condition of IRS approval was the email Mrs. Rodriguez sent on behalf of CCR on March 25, 2016.[130] That email was written more

---

[127] E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 16:7 – 19:18, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18 – 136:19, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25 – 149:16, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 171:19 – 173:23, Doc. 234.
[128] Transcript of NLRB Hearing, J. Ex. J-5, J000081-82; Union Flyer, Pl. Ex. P-3; Joint Motion to Amend the Record, Pl. Ex. P-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 29:11-17, Doc. 234. *See also* Terms of Settlement, J. Ex. J-6.
[129] 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000009.
[130] Email from CCR Theresa Rodriguez to Local 669 and NLRB, et al. (3/25/16), J. Ex. J-31.

than a month after the hearing and only in response to the Union's letter to the NLRB

alerting the NLRB that CCR was failing to comply with the Settlement Agreement.[131]

89.     The affidavit submitted by Mrs. Rodriguez to the NLRB in connection with CCR's

alleged breach of the Settlement Agreement [132] is also inconsistent with the "IRS

approval" defense maintained by Quick Response. There, she stated that she only met

with the IRS after the NLRB hearing and that the terms of the Settlement were never

submitted in writing to the IRS.[133]

90.     The Court concludes, as a matter of fact, that IRS approval was not a condition of the

Settlement Agreement between CCR and the Union.

## FINDINGS OF FACT RE UNRESOLVED TERMS

91.     The next question the Court must resolve is whether the purported NLRB Settlement

Agreement is a binding contract despite the fact that there were some terms left to be

resolved later. As is set forth in more detail in the Conclusions of Law section, in

reaching this decision, the Court must determine whether the unresolved terms were

material or essential to the Settlement Agreement, whether these terms were "sufficiently

definite…so that a court can understand what the promisor undertook" and "whether

[the] essential terms were sufficiently settled to find a contract."[134]

92.     The Court finds that at least two of the unresolved terms were material or essential,

namely, the down payment and the monthly payments.

[131] Revocation of Settlement Agreement Letter, Pl. Ex. P-20; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 35:1 – 36:7, Doc. 234; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 37:5 – 38:4, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 145:5 – 146:14, Doc. 234.
[132] Theresa Rodriguez Affidavit, Pl. Ex. P-21.
[133] Theresa Rodriguez Affidavit, Pl. Ex. P-21, 3-4.
[134] *APS Capital Corp. v. Mesa Air Grp. Inc.*, 580 F.3d 265, 272-73 & n.16 (5th Cir. 2009).

93. While this Court holds that IRS approval was not a condition precedent to the Settlement Agreement, it is clear that the $1 million IRS tax lien was a very important consideration to CCR, and the Union was aware of both its existence and importance to CCR.

94. In pre-settlement correspondence between CCR and the Union, the parties discussed the IRS problem. On February 15, 2016, two days before the NLRB hearing and settlement, Mrs. Rodriguez emailed the Union asking: "What if the IRS decides that we [CCR] need to close?" The Union replied that if, at some later date, the IRS ordered CCR to close, "the company would be required to negotiate [with the Union] over the closing…."[135]

95. Moffett testified that, as of the date of this email, she was aware that CCR had an IRS debt of over $1 million.[136] She also understood Mrs. Rodriguez to be asking on behalf of CCR's owners "what would happen if the IRS decided they [CCR] were not a viable company."[137] Moffett further testified that, at this point in time, she was aware that if someone was in trouble with the IRS, the IRS was probably going to get its money first,[138] that if the IRS had a tax lien against someone, the IRS was going to recover its money,[139] and that an IRS tax lien takes precedent over all other encumbrances.[140]

---

[135] E-mails between CCR and Local 669 Counsel (2/15-16/16)E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 16:7 – 19:18. Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18 – 136:19, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25 – 149:16, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 171:19 – 173:23, Doc. 234.

[136] N. Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25 – 149:11, Doc. 234 ("That's all we were aware of, that they [CCR] had some IRS debt…I think I had heard [that the IRS debt was over a million dollars] [.]"); Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 154:19-24, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 161:10-19, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16)E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4.

[137] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18 – 136:7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4.

[138] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-11, Doc. 234.

[139] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-11, Doc. 234.

[140] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:12-14, Doc. 234.

96. Likewise, Cacioppo testified that he was aware, a few days before February 17, that CCR "owed . . . money to the IRS."[141]

97. During the settlement negotiations both before and during the February 17 hearing, the Union understood that CCR owed over $1 million to the IRS,[142] that CCR was subject to a federal tax lien,[143] that the lien "ha[d] an effect on the Company's cash on hand,"[144] that an IRS tax lien takes precedence over all other encumbrances,[145] and that CCR's very existence was in jeopardy by virtue of its debt to the IRS.[146]

98. During the February 17 negotiations, CCR raised the issue of its existing tax debt to the IRS.[147] Moffett admitted that Mr. and Mrs. Rodriguez "mentioned an IRS debt" and that they discussed the fact that "the IRS lien [had] an effect on the Company's cash on hand."[148] Likewise, Cacioppo admitted that both Mr. and Mrs. Rodriguez informed him that CCR owed the IRS some money.[149]

99. The written Draft Agreement sent by Moffett to Mrs. Rodriguez following the hearing also reflects an understanding of the critical nature of the lien and the impact that the payment terms would have on CCR's ability to make good on the agreement. In

---

[141] Dep. of Anthony Cacioppo, Def. Ex. D-34, at 127:2 – 128:8.
[142] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25 – 149:11, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 154:19-24, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 161:10-19, Doc. 234.
[143] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 85:16-24, Doc. 234; Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 87:12-18, Doc. 234.
[144] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:15-17, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 155:20-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8.
[145] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-14, Doc. 234.
[146] *See* Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 93:2-7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4, at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18 – 136:7, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 149:11-16, Doc. 234.
[147] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 104:15 – 105:4, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:3-5, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:15-17, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 155:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8; Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4 – 137:21.
[148] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:3-5, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 143:15-17, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 1565:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8.
[149] Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4-137:21.

paragraph 1 of this Draft Settlement, Moffitt changed the payment term from eight years to nine years, which the parties had "not negotiated."[150] In the cover email, she conceded that they had discussed the IRS lien at the hearing and that "we understand that the IRS lien has an effect on the Company's cash on hand. It would be useful if we could see the documents detailing the lien so we can best accommodate it where necessary with this Agreement."[151] She further explained that she "was making a proposal, including a very low down payment and lower monthly payments," in order to "spread it out over a longer period of time in order to make those monthly down payments lower."[152]

100. Moffett also testified that CCR had not agreed to this extension of the payment term, nor had CCR agreed to the proposed $25,000 down payment or the $4400 monthly note as set forth in the Draft Settlement agreement.[153] She reiterated that she "was making an initial proposal as to the down payment and the monthly installments with the hopes of getting [CCR] started on their payments as soon as possible."[154]

101. The Draft Settlement differed in other substantive respects from the Settlement Agreement. For example, it required that all settlement payments be automatically withdrawn from CCR's bank account, it outlined the amount the Union benefit funds would receive versus the amount the Union would receive from the monthly installments, it included an agreement by CCR to be bound to and comply with the existing CBA and any subsequent CBAs for a specified duration, specifically, the 9-year

---

[150] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 151:14-15, Doc. 234; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:7-16, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000011.
[151] 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000009.
[152] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:15-20, Doc. 234.
[153] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:21 – 157:5, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000011-12.
[154] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 156:21 – 157:2, Doc. 234.

term of the settlement payments, and it included an agreement that, even if CCR were to pay off the settlement obligation early, it would still be bound to the 9-year term of the CBA.[155]

102. The Court concludes that, under the circumstances existing at the time, the amounts of the down payment and monthly payments were material and essential terms which were not included in the Settlement Agreement of February 17, 2016. Because they were left unresolved and were never agreed to, the Court finds there was no binding contract.

## CONCLUSIONS OF LAW

### IS THE AGREEMENT A BINDING CONTRACT?

103. The Union contends that its February 17, 2016 contract with CCR is binding and that Quick Response is liable to it "as CCR's *alter ego* and/or successor under *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973), pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), for [CCR's] breach and repudiation of the [NLRB Settlement Agreement] that was entered into on February 17, 2016."[156] Quick Response disagrees.

### THE LEGAL STANDARD

104. The Union's breach of contract claim arises under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("Section 301"). Section 301 governs contract disputes between employers and labor organizations. 29 U.S.C. § 185(a).

105. "A section 301 claim must satisfy three requirements: (1) a claim of violation of (2) a

---

[155] *See* Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 104:15-19, 105:5-7, 106:4-107:5, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000012-14; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 219:2 – 220:20, Doc. 234. *See also*, Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 219:12-21, Doc. 234 (testifying that he "wouldn't have agreed" to the automatic withdrawal of settlement payments from CCR's bank account.).
[156] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240, ¶ 100 at 26; *See also* Joint Pretrial Order, Doc. 200 at 1-2.

*contract* (3) between an employer and a labor organization." *Carpenters Local Union No. 1846 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 500 (5th Cir. 1982) (emphasis added).

106. Consequently, the enforceability and validity of the purported NLRB Settlement Agreement as a "contract" under Section 301 is an essential element of the theories of recovery by which the Union seeks to hold Quick Response liable for CCR's breach of the Settlement Agreement. *See Pratt-Farnsworth, Inc.*, 690 F.2d at 500.

107. Questions concerning the enforceability and validity of settlement agreements are determined by federal law "where the substantive rights and liabilities of the parties derive from federal law." *Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984). As the parties' substantive rights and liabilities arise out of federal labor law, federal law governs here. The federal common law of contracts "uses the core principles of the common law of contracts that are in force in most states." *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003) (internal quotation marks omitted).[157]

108. The parties have rightly agreed that the issue should be resolved under federal common law. The Fifth Circuit explained, "Federal contract law is largely indistinguishable from general contract principles under state common law. Thus, in reaching our decision, we will rely not only on federal cases, but also on treatises and state contract law cases to the extent we find them persuasive." *In re DEEPWATER HORIZON,* 786 F.3d 344 at 354–55 (5th Cir. 2015). *See also Retail Clerks Int'l. Ass'n. Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 25-28 (1962) (agreements settling labor disputes between employer and union are governed by Section 301(a) of the Labor

---

[157] Louisiana Law is an exception where the law of contracts is governed by the Louisiana Civil Code. Saúl Litvinoff, OBLIGATIONS § 1.6, in 2 *LOUISIANA CIVIL LAW TREATISE*, 10-13 (2d ed. 2001).

Management Relations Act, 29 U.S.C. § 185); *Smith v. Kerrville Bus Co.*, 709 F.2d 914, 920 (5th Cir. 1983) ("It is well-established that § 301 must be broadly construed to encompass any agreement, written or unwritten, formal or informal, which functions to preserve harmonious relations between labor and management.") (citing *Lion Dry Goods,* 369 U.S. 17). (P-53)

109. "A settlement is valid and enforceable even if it contemplates the parties signing a [document] at a later date." *In re DEEPWATER HORIZON*, 786 F.3d at 355 (bracket and internal quotes omitted). The agreement is not voided "[e]ven if one party ultimately fails to execute or sign the formal . . . documents[.]" *Id.* But the agreement must still contain all of the elements of a binding contract, including that it encompass all of the "material or essential terms." *Id.* at 357 ("A putative contract is unenforceable if it lacks material or essential terms.") (citing 17 C.J.S. *Contracts* § 91 (2014)).

110. Under this federal standard, an initial agreement to settle a matter may be held valid and enforceable even if does not contain many of the details that will be part of the final written agreement:

> It is self-evident that an initial agreement between the parties will not contain all of the terms that will eventually appear in the formal agreement. This, of course, does not categorically render the initial agreement unenforceable—in other words, the requirement that the parties reach an agreement as to 'all material terms' clearly does not require that the parties reach an agreement as to every term. *See Restatement (Second) of Contracts § 33 cmt. a* ('But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.'); *see also Coe* [*v. Cesapeake Expl., L.L.C.,* 695 F.3d 311, 320 (5th Cir 2012)] (noting that non-essential terms may be left open); *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ('A binding settlement may exist when parties agree upon some terms, understanding them to be an agreement, and leave other terms to be made later').

*Lozano v. Metro Transit Auth.*, No. H-14-1297, 2016 U.S. Dist. LEXIS 94031, *26-27 (S.D.Tex. July 19, 2016). See also *McDonnell v. Engine Distribs.*, No. 03-1999, 2007 U.S. Dist. LEXIS 70925, * 10 (D.N.J. Sept. 24, 2007) (An agreement to settle a pending matter need not include "every possible contractual provision to cover every contingency in order to qualify as a completed binding agreement. Some of these issues may be determined by the operation of law, or the parties may resolve such differences by a subsequent agreement, or a contract may be silent in those respects. In any event a contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect. *So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound.*" (emphasis in original) (cited in *In re DEEPWATER HORIZON*, 786 F.3d at 757, n.26)).

111.  However, under federal common law in the Fifth Circuit, an oral settlement agreement is "unenforceable if it lacks material or essential terms."[158] *In re DEEPWATER HORIZON,* 786 F.3d at 357; *see also, Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195, 1200 (10th Cir. 2000) ("If the parties intend to negotiate further the terms of an agreement, a manifestation of willingness to enter into the agreement is only preliminary, and does not demonstrate the existence of a binding contract.").

112.  When an agreement "leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement

---

[158] *See Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419–20 (5th Cir. 2006) ("It is well established that the terms of an oral contract must be clear, certain and definite. A lack of definiteness in an agreement may concern the time of performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred. A contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. A contract will fail for indefiniteness if the parties do not agree on its material terms. If an alleged agreement is so indefinite as to make it impossible for a court to "fix" the legal obligations and liabilities of the parties, a court will not find an enforceable contract. To be legally binding, the parties must have a meeting of the minds, and each must communicate his consent to the terms of the agreement.") (internal quotations and citations omitted).

to agree." *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012) (internal quotes omitted). *See also*, *APS Capital Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272 (5th Cir. 2009) ("'[A]n agreement is not enforceable unless it resolves all essential terms and leaves no material matters open for future negotiation.'") (quoting *Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415 (5th Cir. 1995)); *APS Capital*, *supra* ("[W]here an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable 'agreement to agree.") (*quoting Liberto v. D.F. Stauffer Biscuit Co.,* 441 F.3d 318, 323 (5th Cir. 2006)); *Neeley v. Bankers Tr. Co. of Texas*, 757 F.2d 621, 628 (5th Cir. 1985) ("[T]he omission or failure of an essential element of a contract vitiates the whole.").

113. "Courts generally find there is agreement on all of the material terms of settlement where the parties have agreed upon the monetary amount of the settlement payment and the fact that plaintiffs will release specific claims." *Schaffer v. Litton Loan Servicing, LP,* No. 05-07673, 2012 U.S. Dist. LEXIS 189829, *49 (C.D. Cal. Nov. 13, 2012) (cited in *In re DEEPWATER HORIZON*, 786 F.3d at 757, n.26); *Demissie v. Starbucks Corp. Office & Headquarters*, 118 F. Supp. 3d. 29, 35 (D.D.C. 2015) ("Courts have found that the amount to be paid and the release of liability are material terms to a settlement agreement."); *Lozano*, 2016 U.S. Dist. LEXIS 94031, at *12 (citing to *In re Deepwater Horizon*'s collection of cases "indicating that the amount of settlement payment and release of claims are generally the material terms"). See also *Sands v. Wagner & Hunt, P.A.*, No. 09-60557, 2009 U.S. Dist. LEXIS 77169, *11 (S.D. Fla. Aug. 28, 2009) ("The parties' agreement incorporated all the essential terms: Defendants would pay a sum of money, dismiss the underlying state court action, and delete the tradeline; Plaintiff, in

turn, would dismiss the instant Federal action").

114. Additionally, for material terms of an agreement to be enforceable, those terms "must be sufficiently definite to enable the court to understand each party's obligations." *Coe*, 695 F.3d 311 at 320 (citing, *inter alia*, Restatement (Second) of Contracts § 33(2) (1981) (contract terms are reasonably certain "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.")). *See also*, *Neeley*, 757 F.2d at 627 ("[A] contract is sufficiently definite if a court is able to determine the respective legal obligations of the parties.") (internal quotes and citation omitted); *APS Capital*, 580 F.3d at 272, n.16 ("When conceived in terms of legal enforcement, the principle is in a sense logically demanded, axiomatic: 'In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook.'") (citation omitted). The Fifth Circuit has held that "[t]he recurrent problem of indefiniteness in contract actions raises two species of concern," one that "involves inquiry into whether the parties meant to contract at all," and the other related to "the practical difficulties of *enforcing* obscure, imprecise, or otherwise incomplete promises." *Neeley*, 757 F.2d at 627 (emphasis in original).

115. Whether a term is material or essential is a question of law to be decided by the court on a "case-by-case basis." *Coe*, 695 F.3d at 320.

116. In analyzing whether a term is material or essential the Fifth Circuit instructs:

> Like most questions of contract law, whether a promise or other term forms an essential part of an agreement depends primarily upon the intent of the parties. Thus, an "essential" promise denotes one that the parties reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain. Failure to fulfill such a promise, in other words, would seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole.

*Neeley v. Bankers Tr. Co. of Texas*, 757 F.2d at 628; see also *Demissie v. Starbucks*

*Corp. Office & Headquarters*, 118 F. Supp. 3d 29, 34–35 (D.D.C.2015), *aff'd,* 688 F.
App'x 13 (D.C. Cir. 2017) ("Terms that are not necessary for the parties to understand
how they are expected to perform the contract itself are not considered material."); *see*
*APS Capital Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272–73 (5th Cir. 2009) ("Each
contract should be considered separately to determine its material terms. Courts look not
only at any relevant written agreements but also at the relationship of the parties, their
course of dealings, and then answer the field- and fact-specific question of whether
essential terms were sufficiently settled to find a contract. For instance, in a contract to
loan money, the material terms will generally be: the amount to be loaned, maturity date
of the loan, the interest rate, and the repayment terms.") (internal quotations and
citations omitted).[159]

117.  The Fifth Circuit has described relevant factors to consider in making this determination

in the context of determining whether the "indefiniteness" of those terms render the

---

[159] The Fifth Circuits approach is consistent with the other circuits. *Gates Corp. v. Bando Chem. Indus., Ltd.*, 4 F.
App'x 676, 684 (10th Cir. 2001) ("Essential terms are "determined from the intention of the parties as disclosed
upon consideration of all surrounding facts and circumstances there prevailing."); *Reyes v. Lincoln Auto. Fin. Servs.*,
861 F.3d 51, 58 (2d Cir. 2017), *as amended* (Aug. 21, 2017) ("In contract law, "essential terms" are those terms that
are necessary in order to lend an agreement sufficient detail to be enforceable by a court. *Brookhaven Hous. Coal. v.
Solomon*, 583 F.2d 584, 593 (2d Cir. 1978) ("If essential terms of an agreement are omitted or are phrased in too
indefinite a manner, no legally enforceable contract will result.").") (internal quotations and citations omitted); *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507
(7th Cir. 2007) ("The essential terms must be 'definite and certain' so that a court can ascertain the parties'
agreement from the stated terms and provisions. Whether a 'meeting of the minds' occurred depends on the parties'
objective conduct, not their subjective beliefs.") (internal quotations and citations omitted); *Bath Junkie Branson,
L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) ("The nature and extent of a contract's essential terms
which form the basis of the parties' mutual assent must be certain or capable of being certain. Under the objective
theory of contracts applied in Missouri since 1892, the stress is on the outward manifestation of assent made to the
other party.... The mutuality or meeting of minds is to be determined by the expressed, and not by the secret,
intention of the parties.") (Internal quotations and citations omitted); *Abbott Labs. v. Alpha Therapeutic Corp.*, 164
F.3d 385, 389 (7th Cir. 1999) ("A contract must contain all its essential terms in order to be binding. A writing is
incomplete as an agreement where blanks as to essential matters are left in it, unless the matters can be supplied
from other parts of the writing itself,[3] or unless and until such blanks are lawfully filled. Where a material term to a
contract is missing, the agreement is not legally binding upon the parties. To be binding, such letters must clearly
manifest the desire of each party to be bound to the material terms of the proposed deal. Agreement "in general"
with a clear contemplation that further negotiations as to material terms will be required is simply not enough to
form ties that bind.") (internal citations omitted).

agreement unenforceable:

> [This] determination turn[s] largely on the type of contract at issue ....";
> "Each contract should be considered separately to determine its material
> terms." Courts look not only at any _relevant written agreements_ but also at
> the _relationship of the parties_, _their course of dealings_, and _then answer_ the
> field- and fact-specific question of _whether essential terms were sufficiently
> settled to find a contract_. For instance, "[i]n a contract to loan money, the
> material terms will generally be: the amount to be loaned, maturity date of
> the loan, the interest rate, and the repayment terms."

_APS Capital_, 580 F.3d at 272-73 (citations omitted) (emphasis added).

## ANALYSIS

## WERE THE UNRESOLVED TERMS MATERIAL AND ESSENTIAL?

118. Plaintiff contends all material and essential elements of a binding contract were entered

into on the record at the NLRB hearing. The Settlement Agreement identified the total

amount of money that CCR was required to pay and the release of claims that the Union

was making in exchange. "CCR Fire Protection will pay $450,000 in monthly

installments;" "[t]here will be a confession of judgment in the federal court case related

to the unpaid benefit funds;" in exchange, the Union will "withdraw the charges" against

CCR.[160]

119. Plaintiff argues that as a matter of law, the fact that the parties' on-the-record Settlement

Agreement did not include certain items is irrelevant. These, argue the Union, were mere

"details" regarding how the total amount of $450,000 was to be paid by CCR – the

number of years over which payment would occur, how much of the total was down

payment, how much each monthly payment would be, how much would be paid to the

benefit funds, whether by direct deposit or not. The Union insists that these details all

relate solely to the _implementation_ of the parties' settlement agreement. They are thus

---

[160] Doc. 139, ¶ 59 at 17-18 citing Transcript of NLRB Hearing, J. Ex. J-5, at J000081-83.

not essential elements of the Settlement Agreement itself and their absence does not negate the binding nature of the agreement. *Lozano*, 2016 U.S. Dist. LEXIS 94031, at *26-27; *McDonnell*, 2007 U.S. Dist. LEXIS 70925, at *23-24 ("The disputed terms - concerning the scope of the release, ensuring payment, tax treatment, indemnification, and the scope of confidentiality - all speak to the settlement's implementation. They are not, however, essentials of the settlement. The Court therefore will not reconsider its January 16 Order [to enforce the Settlement Agreement] on this basis."); *Sands*, 2009 U.S. Dist. LEXIS 77169, at *13 (confidentiality provision not essential term because "it is directed to the manner in which the agreement would be implemented and its exclusion does not bar enforcement of the settlement agreement."); *Id.* at *14-15, n.8 ("The absence of a general time for performance is not fatal to the enforceability of this contract."). *Magee v. ENSCO Offshore Co.*, No. CIV.A. 11-1351, 2013 U.S. Dist. LEXIS 76009 at *10-11 (E.D. La. May 30, 2013) (It was not a material change to pay medical expenses to another provider rather than to the individual provider. "ENSCO still owed the same amount of money that it agreed to pay at the time of the settlement, it simply owed the payment to a different entity.").[161]

120. Plaintiff contends specifically that the down payment and monthly installment amounts were not material and essential but, rather were merely incidental items that dealt with "the settlement's implementation" and therefore the contract is a binding one.[162]

121. Plaintiff points the Court to cases holding that when parties reach an agreement as to the general terms of a settlement agreement the terms not discussed or that become an issue

---

[161] Doc. 239, ¶ 68 at 21.
[162] Plaintiff's Proposed Findings of Fact, Doc. 239 ¶ 68 at 21, citing *Lozano v. Metro. Transit Auth.*, No. H -14-1297, 2016 U.S. Dist. LEXIS 94031, at *26-27 (S.D. Tex. July 19, 2016), and *McDonnell v. Engine Distribs.,* No. 03-1999, 2007 U.S. Dist. LEXIS 70925, at *23-24 (D. N.J. Sep. 24, 2007).

during memorialization are not essential. *See Demissie v. Starbucks Corp. Office & Headquarters*, 118 F. Supp. 3d 29, 35 (D.D.C. 2015), *aff'd,* 688 F. App'x 13 (D.C. Cir. 2017) ("Terms that were not discussed by the parties during negotiations, but are only brought up after-the-fact, may be deemed immaterial.").[163]

122. Quick Response counters that the unresolved amounts for the down payment and monthly payments were material and essential terms absent which there could be no binding contract. It maintains that "courts across the country routinely consider specific, identifiable monthly payments on a principal sum to be a material term of [the] settlement."[164]

123. Indeed, in some circumstances, courts have found specific payment terms to be material or essential to a contract. *See Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195,

---

[163] *See also McDonnell v. Engine Distributors*, No. CIV.A. 03-1999, 2007 WL 2814628, at *8 (D.N.J. Sept. 24, 2007), *aff'd,* 314 F. App'x 509 (3d Cir. 2009) ("The fact that their proposed memorializations vary considerably with one another in no way disturbs the validity of that agreement. The disputed terms—concerning the scope of the release, ensuring payment, tax treatment, indemnification, and the scope of confidentiality—all speak to the settlement's implementation. They are not, however, essentials of the settlement."); *Jericho Grp. Ltd. v. Mid-Town Dev. Ltd. P'ship*, 2016 WL 11263660, at *10 (E.D.N.Y. Dec. 5, 2016), *report and recommendation adopted,* 2017 WL 4221068 (E.D.N.Y. Sept. 22, 2017) ("It almost goes without saying that an oral statement of a settlement is not fully integrated and complete. It is, by definition, an outline of terms that the parties later intend to flesh out and reduce to writing. A trial court's inherent power to enforce summarily a settlement agreement where the terms of the agreement are clear and unambiguous ... is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings. A settling party—no matter how acute its buyer's remorse—may not assert ambiguity to undo the settlement when the record contains an agreement that is clear on its face.")

[164] Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, Doc. 239; Defendant's Findings of Fact and Conclusions of Law, Doc. 240 ¶ 132 at 37, citing *Mba v. HSBC Bank USA N.A.*, No. 3:13-CV-4769-L-BK, 2015 WL 9701152, at *3 (N.D. Tex. Dec. 4, 2015) (considering specific monthly payments, i.e. the specific monetary amount to be paid each month, to be a material term of settlement); See also *Atlas Trading Conglomerate Inc. v. AT&T Inc.*, No. 3:15-CV-0404-K, 2016 WL 5870857, at *1-5 (N.D. Tex. Oct. 5, 2016) (finding breach of settlement agreement for failure to make monthly payments, which were explicit and identifiable under the terms of the agreement); *JSC Transmashholding v. Miller*, 264 F. Supp. 3d 201, 205-06 (D. D.C. 2017) (finding settlement agreement setting forth payment schedule of specific, monthly payments to pay off the total amount due thereunder to be valid and enforceable because "'each party could be reasonably certain how it was to perform'" and holding that the agreement was breached because the obligor failed to make those monthly); *Vazquez v. Royal Sweets, Inc.*, No. 8:12-CV-2763-T-TBM, 2014 WL 12868887, at *2 (M.D. Fla. Feb. 20, 2014) (finding settlement agreement setting forth monthly payment schedule of $1000 per month to pay off $8000 principal was breached for failure to make the monthly payments); *VF Dev. v. Greaves*, No. 2009-138, 2011 WL 4500295, at *4 (D.V.I. Sept. 27, 2011) (finding that essential terms of settlement agreement included payment of "$430,000 in monthly installments of $5,000").

1200 (10th Cir. 2000) ("Important material terms such as the funding date, interest rate, and payment schedule ... were not determined at that time.") (internal quotations omitted).[165]

124.  As stated earlier, the Fifth Circuit has instructed that whether a term is material or essential must be decided on a "case-by-case basis." *Coe*, 695 at F.3d at 320. Thus the Court's determination "of the field- and fact-specific question of whether essential terms were sufficiently settled to find a contract" should be decided based on the specific circumstances of this case.

125.  On February 15, 2016, Osborne responded to this request with an email to Mrs. Rodriguez. Moffett was copied on that email.[166]  In the email, Osborne proposed terms of settlement, which included an agreement by CCR to pay "$450,000 payable in monthly installments over 8 years" and to "remain bound to the current and any successor agreements with Local 669 for the same term."[167]  Mrs. Rodriguez testified

---

[165] *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006) ("As a general matter, Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify "the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred."); *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("the parties never had a meeting of the minds regarding the precise method for securing payment of the settlement. As mentioned earlier, the district court only has the power to enforce complete settlement agreements.") (internal quotations and citations omitted); *Anderson v. Comm'r*, 568 F.2d 386, 390 (5th Cir. 1978) ("To be final the agreement must extend to all the terms which the parties intend to introduce, and material terms cannot be left for future settlement. . . In particular, a binding contract for the sale of property must specify the seller, the buyer, the price to be paid, the time and means of payment, and the property to be transferred.") (internal quotations and citations omitted); *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 747 (Tex. App. 2014) ("The court of appeals concluded that the record nevertheless established the essential terms of a settlement agreement because, like Stergiou and the GMF Companies, the parties agreed as to the exact amount of the payments and the period over which they were to be made. Additional terms regarding overdue, or post-maturity, interest and acceleration upon default were not necessary to enable the parties to comply with the terms of the note, or the underlying settlement agreement ....") (internal quotations and citations omitted); *Franco Marine 1, LLC v. Great Lakes Towing Co.*, No. 1:17CV2506, 2018 WL 2985185, at *5 (N.D. Ohio June 14, 2018), *appeal dismissed,* No. 18-3635, 2019 WL 3035585 (6th Cir. Mar. 8, 2019) ("[T]here is no meeting of the minds as to essential terms of a contract when the agreement did not include the amount of down-payment and financing terms.").

[166] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 92:17-20, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:3, Doc. 234.

[167] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 93:2-7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:3, Doc. 234.

that the latter obligation would have resulted in CCR having to pay an additional $19,000 to $30,000 per month in contributions to the Union and the Union benefit funds.[168]

126. That same day, Mrs. Rodriguez responded by email to both Osborne and Moffett and posed "[q]uestions from the owners" of CCR, which included the following: "What if the IRS decides that we are not a viable company and decides we need to close?"[169]

127. Moffett testified that, as of the date of this email, she was aware that CCR had an IRS debt of over $1,000,000.[170] She also understood Mrs. Rodriguez to be asking on behalf of CCR's owners "what would happen if the IRS decided they [CCR] were not a viable company."[171] Moffett further testified that, at this point in time, she was aware that if someone was in trouble with the IRS, the IRS was probably going to get their money first,[172] that if the IRS had a tax lien against someone, the IRS was going to recover their money,[173] and that an IRS tax lien takes precedent over all other encumbrances.[174] Likewise, Mr. Cacioppo testified that he was aware, a few days before February 17, that CCR "owed . . . money to the IRS."[175]

128. At the NLRB hearing on February 17, 2016, the parties placed on the record an "*agreement in principle*" that "CCR Fire Protection will pay $450,000 in monthly installments over eight years to the Union and Union benefit funds *with a down payment*

---

[168] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 95:3-13, Doc. 234.

[169] Trial Test. of Theresa Rodriguez, Trial Tr. vol. 1, 18:10-24, 93:2-7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4at J000076; Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18-25, 136:4-7, 149:12-16, Doc. 234; Trial Test. of J.R. Rodriguez, Trial Tr. vol. 1, 172:22-174:3, Doc. 234.

[170] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 148:25-149:11, ("That's all we were aware of, that they [CCR] had some IRS debt. . . .I think I heard that [that the IRS debt was over one million dollars][.]"), 154:19-24, 161:10-19, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4at J000076.

[171] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 135:18-136:7, Doc. 234; E-mails between CCR and Local 669 Counsel (2/15-16/16), J. Ex. J-4at J000076.

[172] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-11, Doc. 234.

[173] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:5-11, Doc. 234.

[174] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 150:12-14, Doc. 234.

[175] Dep. of Anthony Cacioppo, Def. Ex. D-34, at 127:2-128:8.

*in an amount to be agreed upon by the parties at a later date*."[176]  The Union's attorney,

Moffett, understood that the terms left to be decided for a future date were the "down

payment and the monthly installments."[177]

129. During the negotiations which preceded the Settlement Agreement, Moffett admitted

that Mr. and Mrs. Rodriguez "mentioned an IRS debt" and that they discussed the fact

that "the IRS lien [had] an effect on the Company's cash on hand."[178]  She also testified

that the parties "did not agree on that day to the amount of the down payment," which

"was left blank to be resolved once we knew more about this debt to the IRS and how

much they could pay. … How much they could pay as a down payment" on the

$450,000.[179]  Moffett elaborated on what she recalled about these negotiations when

questioned by the Court.  She testified that the parties "had a meeting of the minds of the

amount, 450,000," but that "*they [CCR] asserted that they weren't sure – that they had*

*this IRS debt, which they had indicated [to the Union] that they had before*, and that *they*

*[CCR] weren't sure with that amount [the IRS debt] how much they were going to be*

*able to make in a down payment and the monthly installments* and we agreed that we

could discuss that amount and the monthly installments going forward and that *we would*

*make a proposal as to a down payment and an amount and put it in a written settlement*

*agreement . . . and that we would submit that to them*."[180]

130. In answering the fact-specific and case-specific question of "whether [the] essential

---

[176] Transcript of NLRB Hearing, J. Ex. J-5, at J000081.

[177] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 167:12 – 168:3, Doc. 234 (emphasis added).

[178] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:2-5, 143:15-17, 155:16-23, Doc. 234; 2/26/2016 Email from Moffett to Theresa re: draft settlement agreement, Def. Ex. D-8, at DEF000009. Likewise, Mr. Cacioppo admitted that both Mr. and Mrs. Rodriquez informed him that CCR owed the IRS some money. Dep. of Anthony Cacioppo, Def. Ex. D-34, at 136:4-15, 137:1-21.

[179] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 141:9-22, Doc. 234.

[180] Trial Test. of Natalie Moffett, Trial Tr. vol. 1, 167:12-168-3, Doc. 234 (emphasis added).

terms were sufficiently settled to find a contract," *APS Capital*, 580 F.3d at 272-73, the Court concludes that they were not. First, the fact that the payment terms were contemplated, but never reached, made it impossible to "understand each party's obligations," *Coe*, 695 F.3d at 320, and "enforce[] … [these] incomplete promises," *Neeley*, 757 F.2d at 627. Moreover, this failure by the parties to determine a payment plan for the $450,000, particularly where the parties could reasonably expect that CCR would have to close if the IRS lien was not satisfied and might not be able to make *any* payments, demonstrates that the agreement had not been "sufficiently settled." Indeed, Moffett's unilateral extension of the payment term supports this conclusion. Accordingly, because the material terms were not sufficiently settled, the Settlement Agreement is not enforceable as a matter of law as it fails to "resolve[] all essential terms and leaves [] material matters open for future negotiation." *See APS Capital*, 580 F.3d at 272.

131. While the Court finds that IRS approval was not a condition of the Settlement Agreement, it is clear to the Court that, at the time of the settlement, both parties were aware of the very large IRS lien and its importance not just to the Settlement Agreement but to CCR's continued existence. This is key because it emphasizes the importance and significance of the amount of the down payment and monthly payments as material and essential terms of the contract *in this case*.

132. Under these circumstances, the Court finds that these terms were "essential", i.e. were "a vitally important ingredient in their bargain." *Neeley v. Bankers Tr. Co. of Texas*, 757 F.2d at 628. The failure of the parties to agree to these terms is fatal to the contract.

133. In sum, the Court finds that the Settlement Agreement did not constitute a binding

contract.

### ISSUES OF QUICK RESPONSE'S STATUS AS THE ALTER-EGO AND/OR *GOLDEN STATE* SUCCESSOR OF CCR

134.   Because the Court holds that there was no binding contract between the Union and CCR, the Court need not consider the issue of whether Quick Response was the alter ego or *Golden State* successor of CCR.

### CONCLUSION

135.   Because there was no binding Settlement Agreement between the Union and CCR, judgment will be entered in favor of CCR and Quick Response and against the Union, dismissing its demands with prejudice.

Signed in Baton Rouge, Louisiana, on September 27, 2019.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**